T.C. Memo. 2006-155

UNITED STATES TAX COURT

CHERYL McKNIGHT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3398-05.                    Filed July 27, 2006.

<u>Michael P. Merrion</u>, for petitioner.

<u>Michael W. Lloyd</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  The issue for decision is whether petitioner is entitled to additional relief under section 6015 from joint liability for 1995 Federal income taxes, and related penalty, additions to tax, and interest.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and

all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioner resided in Golden, Colorado.

Petitioner has a background in property management and has completed 1 year of college. Petitioner has no children.

In September of 1986, petitioner met John McKnight (John). In 1987, John and his then wife Sally Overton (Overton) divorced. Shortly thereafter, petitioner and John began dating. John has a son from his marriage to Overton.

John acted as a sales representative for construction product manufacturers. John operated his business as a sole proprietorship under the name of McKnight and Associates.

As petitioner and John's dating relationship developed, petitioner allowed John to use petitioner's personal credit cards to pay a number of John's business expenses. Initially, John promptly repaid petitioner so that petitioner could timely make her credit card payments.

In 1990, John asked petitioner to work in his business. John told petitioner that he needed her help to expand the business and that he would pay petitioner the same amount that

she earned in her prior job. Petitioner accepted John's offer, quit her job, and went to work for John.

Petitioner's responsibilities working in John's business included answering phone calls, bookkeeping, taking orders for products, and other clerical tasks.

After a month, petitioner asked John why she was not getting paid. John explained to petitioner that he had not yet received enough commissions to pay her but that he soon would do so. However, from the time petitioner began working for John and his business in 1990, petitioner never was paid any wages or other compensation for her work.

On October 12, 1992, petitioner and John were married. Around the time of their marriage, John sold his home in Westminster, Colorado, and petitioner and John moved into a new home in Castle Rock, Colorado (Castle Rock home). Using petitioner's poor credit as the excuse and even though John himself was responsible for petitioner's poor credit rating, John titled the Castle Rock home only in his name. John promised petitioner that at a later date he would put petitioner's name on the title to the home, which he never did.

To finance his business, John took out multiple second and third mortgages on the Castle Rock home.

Sometime after they were married, petitioner and John decided to trade in on a new car a car which petitioner had owned

prior to their marriage. John titled the new car only in his name. John told petitioner that he had mistakenly omitted petitioner's name from the car title, but John later acknowledged that he had done so intentionally.

After petitioner married John, John's spending began to spiral out of control. John increased the amount and frequency of charges he made on petitioner's credit cards, and John became increasingly delinquent in payments to petitioner to cover the expenses so charged. At one point, John's charges to petitioner's credit cards relating to John's business reached a total outstanding balance of $38,000.

With her own funds, petitioner eventually paid off a significant portion of John's charges to her credit cards.

On December 30, 1993, John incorporated his sales representative business as MGI/McKnight Group, Inc. (MGI). An election was filed with respondent to have MGI treated as an S corporation.

At John's insistence, petitioner signed the MGI articles of incorporation, and petitioner, along with John, was listed on the MGI articles of incorporation as a director of MGI. Petitioner, however, was not aware of the legal significance of signing the MGI articles of incorporation or of being listed as a director.

John always made it clear to petitioner that he regarded himself as sole owner of the business and of MGI and that he did

not recognize petitioner as having an ownership interest in MGI. Shares of MGI stock apparently were never issued.

To the extent petitioner held an ownership interest in MGI, it was only a nominal interest. Without consulting petitioner, John made all of the decisions relating to MGI. Petitioner did not make a capital contribution to MGI, did not receive MGI stock, did not have signatory authority on MGI's bank account, did not know what title or position she nominally held in MGI, received no distributions from MGI, and as explained, never received wages or other compensation from MGI.

Throughout their marriage, petitioner generally kept track of the household bills and expenses, but petitioner would show the bills to John. John would decide which bills to pay and when to pay them. Periodically, John would transfer just enough money into the marital joint checking account for petitioner to write checks to pay bills he had approved. Petitioner did not have access to John's personal and business bank accounts.

Prior to their marriage, in an effort to convince petitioner to marry him, John had checked himself into an alcohol abuse treatment center. However, on the night of their marriage John resumed drinking.

Throughout his marriage to petitioner, John's problems with alcohol increased. On three occasions during the marriage, John was arrested for driving under the influence.

In November of 1994, a tractor-trailer hit and injured John. The accident occurred as John was walking drunk on the shoulder of a highway. John filed a lawsuit against the truck driver and the trucking company. In a settlement of the lawsuit, the trucking company awarded John and petitioner jointly an $80,000 deferred annuity.

In part as a result of John's injuries from the accident, MGI's business began to do poorly. John could not leave his home to make sales calls, and John became argumentative with his clients, most of whom soon terminated their contracts with MGI.

In addition to not paying petitioner for her work, ruining her credit, and putting major marital assets only in his name, John became both mentally and physically abusive to petitioner, which abuse escalated throughout the marriage.

Due to his drinking problem, John often would go into rages where he would shove and hit petitioner.

John purchased firearms and other weapons which he kept in the home. Petitioner feared John and believed that John might use his weapons to seriously harm her.

In January of 1995, John beat petitioner with his crutches. Upon petitioner's request, the police removed 12 firearms from the home. The night of the beating petitioner left the home to stay with a friend.

When petitioner returned home to retrieve her belongings, John had changed the locks and boarded up the windows.

Petitioner did not have a job, credit, nearby family, or other means of support, and only a few articles of clothing in her possession. John apologized to petitioner for his behavior. Because she felt she did not have an alternative, petitioner moved back in with John. Thereafter, John's conduct toward petitioner became worse.

From the Internet John downloaded pornography and while on trips was unfaithful to petitioner.

In one incident that occurred in the summer of 1997, John broke a wine glass on a table and with the broken glass slashed petitioner's throat. Petitioner fought off John and managed to lock herself in a room. Instead of going to a hospital, petitioner did her best to stop the bleeding and to close up the wound. Petitioner feared that if she sought medical treatment John would be arrested and that he might seek to kill her.

Soon after the above incident, petitioner secretly packed up many of her belongings and moved into a motel in a nearby community.

Petitioner stayed in the motel for several weeks before finding a job and moving into an apartment.

In December of 1997, John filed for divorce from petitioner so that he could marry another woman.  On October 16, 1998, petitioner and John's divorce became final.

As of the time of the divorce, John had borrowed against all of the equity in the Castle Rock home and had spent or consumed all of the loan proceeds along with most other marital assets.

In the divorce, the $80,000 deferred annuity relating to John's accident was split into two $40,000 deferred annuities, one of which petitioner received, and John received the other.[1] Petitioner also received possession of a used car, which car John, contrary to the divorce decree, never transferred into petitioner's name.

With regard to petitioner and John's 1995 joint Federal income taxes, the divorce decree stated:  "[John] shall be solely responsible for payment of all such taxes, including all interest and penalties...and * * * [John] shall indemnify and hold * * * [petitioner] harmless therefrom."

In December of 1998, John remarried and moved to Tennessee. Two weeks later, on January 4, 1999, John was found dead.  John died intestate.

On November 27, 2000, Overton, John's first wife, petitioned the Chancery Court of Bedford County, Tennessee, to allow her to

---

[1] As of the trial herein, petitioner had received total installment payments of $30,000 on the $40,000 annuity.  The remaining $10,000 is scheduled to be paid to petitioner in 2006.

administer John's intestate estate.  The Court granted Overton's petition, opened a probate proceeding relating to John's estate, and appointed Overton as personal representative.

John's estate consisted primarily of one asset (namely, the balance due on John's separate $40,000 deferred annuity relating to his 1994 accident).

Apparently, only two claims were filed against John's estate:  (1) A claim filed by respondent for unpaid taxes; and (2) a claim filed by Overton for support and for an allowance for her then minor child.

Petitioner was not notified until 2003 about the probate of John's estate, by which time petitioner apparently was time-barred from filing a claim against the estate for the portion of the 1995 joint Federal income taxes, penalty, additions to tax, and interest which petitioner had paid (see below) but all of which John was obligated to pay under the divorce decree.

At the time of the trial herein, petitioner earned approximately $52,000 a year, rented a comfortable home, and was trying to rebuild her life.

On approximately August 19, 1996, petitioner and John timely filed their 1995 joint Federal income tax return on which was reflected a Federal income tax underpayment or balance due of $17,516 (the underpayment).  The tax return also reflected that for 1995 petitioner and John had made no estimated income tax

payments and that no income taxes had been withheld from wages or salary on their behalf.[2]

All of the reported income on petitioner and John's 1995 joint Federal income tax return, with the exception of a small amount of interest income, consisted of income from MGI. On the above tax return and on related Schedules K-1, Shareholder's Share of Income, Credits, Deductions, etc., MGI's reported income was reflected as allocable equally to petitioner and to John.

Petitioner was generally aware of the $24,050 interest deductions on the mortgages and the $109,742 MGI income that were reflected on her and John's 1995 joint Federal income tax return.

From October of 1996 through December of 1997, with joint marital assets, petitioner and John made 13 additional payments totaling $11,657 on their $17,516 underpayment for 1995.

On January 13, 1998, after an audit of petitioner and John's 1995 joint Federal income tax return, respondent mailed to

---

[2] Also mailed to respondent with petitioner and John's 1995 joint Federal income tax return was a $1,000 partial payment toward the $17,516 balance due reflected on the return. As a result, the amount of petitioner and John's 1995 tax underpayment apparently should be $16,516. Both parties, however, have treated the entire $17,516 balance due as the underpayment. For convenience herein, we refer to the underpayment amount as $17,516 and leave any modification thereof to the parties' Rule 155 computation. Further, with their 1995 tax return and the $1,000 payment, petitioner and John mailed to respondent an additional $7,235 check reflecting the balance due on their then outstanding 1993 joint Federal income taxes, and petitioner and John made a request to pay in installments the remaining $16,516 balance due on their 1995 income tax liability.

petitioner and to John a notice of deficiency.  In the notice of deficiency, respondent disallowed $19,721 in mortgage interest deductions, charged petitioner and John with self-employment taxes on the MGI income, and determined a tax deficiency against petitioner and John of $6,452 (the deficiency).  Respondent also determined that petitioner and John were liable for a $1,290 accuracy-related penalty.

Respondent mailed the above notice of deficiency to John's separate address.  John did not inform petitioner that he had received the notice of deficiency.  Neither petitioner nor John filed with this Court a petition for redetermination of the deficiency.

Petitioner did not learn of the notice of deficiency until after respondent had assessed the deficiency.

In further payment of the balance due on the underpayment, the deficiency, the related penalty, and the additions to tax (that were later assessed) and interest, respondent offset and applied Federal income tax refunds that were due to petitioner for 1999 through 2002, and petitioner individually made a number of additional $938 installment payments to respondent.  Also, John's estate made a $12,663 payment.  The below schedule summarizes the various payments made jointly by petitioner and John, as well as the separate payments made by petitioner and by John's Estate:

| Payments | | | Petitioner & John's Total 1995 |
| --- | --- | --- | --- |
| | | John's | Federal Income Taxes, Penalty, |
| Joint | Petitioner | Estate | Additions to Tax, & Interest |
| $12,657 | $8,234 | $12,663 | $33,554* |

> \* Respondent's certificate of assessment reflects that petitioner and John's total 1995 Federal income tax liability and related amounts as determined by respondent consist of the $17,516 tax underpayment, the $6,452 tax deficiency, the $1,290 accuracy-related penalty, two separately assessed sec. 6651(a)(2) failure-to-pay additions to tax of $513 and $3,004, and interest of $4,779, all totaling $33,554.

For years following 1995, petitioner has made a good faith effort to comply with the Federal income tax laws.

On February 24, 2004, petitioner requested relief under section 6015(b), (c), and (f) from her joint 1995 Federal income tax liability, including penalty, additions to tax, and related interest paid.

On May 26, 2004, respondent's Compliance Office proposed to grant petitioner full relief from liability for the underpayment and deficiency under a combination of section 6015(f) and (b), as follows, subject to any applicable refund limitations under Rev. Proc. 2003-61, sec. 4.04(2), 2003-2 C.B. 296, 299:

| Nature of Liability | Amount of Liability | Compliance Office Proposed Relief Amount* | Basis for |
| --- | --- | --- | --- |
| Underpayment | $17,516 | $17,516 | Sec. 6015(f) |
| Deficiency | $ 6,452 | $ 6,452 | Sec. 6015(b) |

> \* Plus additional amounts for the related penalty, additions to tax, and interest.

Overton, however, as executor of John's estate, contacted respondent's Compliance Office and objected to petitioner's request for innocent spouse relief. At the hearing, Overton alleged that petitioner actively participated in the day-to-day operation of John's business, that petitioner owned a 50-percent interest in MGI, and that petitioner was financially able to bear the burden of payment of petitioner and John's 1995 joint Federal income taxes. Overton also expressed concern that if petitioner were granted relief, respondent's claim for payment from John's estate of additional amounts likely would reduce any payment her son might receive from John's estate.

Respondent's Compliance Office reviewed Overton's objection to petitioner's request for innocent spouse relief but did not alter the proposal to grant full relief to petitioner.

On August 20, 2004, Overton mailed a letter to respondent's Compliance Office in which she formally objected to any relief being given to petitioner. Based on Overton's written objection, respondent's Compliance Office transferred petitioner's request for innocent spouse relief to respondent's Appeals Office for further review.[3]

On November 17, 2004, respondent's Appeals Office determined that petitioner qualified for relief from joint liability under

---

[3] At the trial herein, Overton did not participate as a party, but she did testify as a witness.

section 6015(f) only with respect to 50 percent of petitioner's and John's $17,516 underpayment and under section 6015(c) only with respect to 50 percent of petitioner and John's $6,452 deficiency, as follows, subject to any applicable limitations under Rev. Proc. 2003-61, sec. 4.04(2) and sec. 6015(g)(3):

| Nature of Liability | Amount of Liability | Appeals Office Relief Amount | Basis for |
|---|---|---|---|
| Underpayment | $17,516 | $8,792 | Sec. 6015(f) |
| Deficiency | $6,452 | $3,226 | Sec. 6015(c) |

Respondent's Appeals Office's determination (to grant petitioner relief from joint liability only as to 50 percent of the $17,516 underpayment and as to 50 percent of the $6,452 deficiency) was based primarily on respondent's analysis that the other 50 percent of the underpayment and the other 50 percent of the deficiency were attributable to what respondent regarded as petitioner's 50-percent ownership interest in MGI.

With regard to the portion of the underpayment from which respondent determined that petitioner should be granted relief under section 6015(f), respondent's Appeals Office determined that the factors set forth in Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298, supported such relief.

With regard to the portion of the deficiency from which respondent determined that petitioner should be granted relief

under section 6015(c), respondent's Appeals Office determined that petitioner satisfied the requirements of section 6015(c).[4]

Petitioner contends that under section 6015(b), (c), or (f) she is entitled to full relief for the entire $17,516 underpayment, the entire $6,452 tax deficiency, and the related penalty, additions to tax, and interest.

OPINION

Taxpayers filing joint Federal income tax returns are generally jointly liable for all taxes due thereon.  Sec. 6013(d)(3).  Limited relief from joint liability, however, may be available under section 6015(b), (c), and (f).

Based on the express statutory language, relief from joint liability under section 6015(b) and (c) is limited to tax deficiencies and is not available for underpayments.  Hopkins v. Commissioner, 121 T.C. 73, 88 (2003).

Under section 6015(b), relief from joint liability for a Federal income tax deficiency is available only where:

---

[4]  Although respondent determined that petitioner met the statutory requirements for relief under sec. 6015(c), in an alternate writeup respondent concluded that even though petitioner had actual knowledge of the items giving rise to the deficiency, petitioner, because of the abuse she suffered from John, still should be regarded as generally qualified for such relief.  See sec. 1.6015-3(c)(2)(v), Income Tax Regs. (abused spouse not treated as having actual knowledge of items on joint return for purposes of sec. 6015(c) where her failure to question the tax return treatment of such items was caused by fear of retaliation).

(1) The joint tax return contains an understatement of tax attributable to the spouse not requesting relief;

(2) the spouse seeking relief establishes that in signing the return he or she did not know, and had no reason to know, that there was such a tax understatement;

(3) taking into account all the facts and circumstances, it would be inequitable to hold the spouse requesting relief liable for the tax deficiency related to such a tax understatement; and

(4) the spouse requesting relief timely elects the benefit of section 6015(b).

Under section 6015(b), a requesting spouse is regarded as knowing or as having reason to know of a tax deficiency if the spouse was aware of the transactions or items that gave rise to the tax deficiency or had reason to know that a deduction would give rise to an understatement of tax. Purcell v. Commissioner, 826 F.2d 470, 473-474 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Jonson v. Commissioner, 118 T.C. 106, 115 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

Under section 6015(c), relief from joint liability for a Federal income tax deficiency is available if the following conditions, among others, are satisfied:

(1) At the time the election of section 6015(c) is filed, the two spouses are divorced, legally separated, or otherwise have been living apart for the preceding 12 months; and

(2) the requesting spouse, at the time the return was signed, did not have actual knowledge of the items giving rise to the deficiency.

Relief under section 6015(c) generally is limited to the portion of a tax deficiency that would be allocated to the nonrequesting spouse if separate returns were filed.  Sec. 6015(c)(1), (c)(3), (d).

Under section 6015(f), so called "equitable" relief from joint liability may be available for tax deficiencies with respect to which section 6015(b) and (c) relief has been denied and for underpayments of Federal income taxes reported on Federal income tax returns.

Equitable relief under section 6015(f) from joint liability may be available where the facts and circumstances indicate that it would be inequitable to hold the requesting spouse liable for the tax underpayment or the tax deficiency.  Sec. 6015(f)(1).

The relief available under section 6015(f) generally is limited further to the portion of a tax underpayment or deficiency attributable to an item of the nonrequesting spouse. Rev. Proc. 2003-61, sec. 4.01(7), 2003-2 C.B. at 297.

Under Revenue Procedure 2003-61, section 4.01(7)(b), an exception is provided to the above limitation denying section 6015(f) equitable relief from the portion of a tax liability attributable to an item of the requesting spouse where the requesting spouse establishes that her ownership of the assets producing the income was only nominal.

Rev. Proc. 2003-61, sec. 4.03(2), elaborates further on various factors to consider in reviewing requests for section 6015(f) equitable relief.  No one factor will control, and all relevant factors are to be considered and weighed.  The factors set forth in Rev. Proc. 2003-61, supra, are not intended to be exhaustive.  Rev. Proc. 2003-61, supra.

We review respondent's denial of section 6015(f) equitable relief for an abuse of discretion.  Hopkins v. Commissioner, supra at 87; Cheshire v. Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002).

Section 6015(b) Relief

As explained, section 6015(b) relief is available only for tax deficiencies, not underpayments.  Respondent correctly concluded that petitioner fails to qualify for relief under section 6015(b) as to her joint liability for the $6,452 tax deficiency.

Petitioner had knowledge of the interest on the home mortgages and of the various business activities and income of MGI.  Cf. sec. 1.6015-3(c)(4), Example (1), Income Tax Regs. Although John made all the financial decisions, petitioner tracked and paid the bills, including the mortgage payments.

Petitioner does not qualify for section 6015(b) relief for any portion of the tax deficiency at issue herein.

Section 6015(c) Relief

As explained, respondent concluded that petitioner qualified generally for relief under section 6015(c).  Respondent, however, concluded that only 50 percent of the $6,452 deficiency was attributable to John and therefore granted relief to petitioner from joint liability under section 6015(c) only as to 50 percent (or $3,226) of the $6,452 tax deficiency.

The entire $6,452 deficiency, however, is attributable to John.  John owned all of MGI beneficially, and whatever interest in MGI petitioner may have held was only as a nominee.  Petitioner has established that none of the income from MGI should be attributable to her.  Further, John, not petitioner, owned the Castle Rock home to which the disallowed mortgage interest deductions relate.

Petitioner therefore qualifies under section 6015(c) for relief from joint liability as to the entire $6,452 deficiency.[5]

---

[5]  Sec. 6015(g)(3), however, provides that no credit or refund will be allowed as a result of sec. 6015(c) relief. Herein, the entire $6,452 deficiency has been paid, and therefore petitioner is not entitled to a refund of any amounts that petitioner paid on the deficiency.  If, however, we were to hold that petitioner did not qualify for relief from the deficiency under sec. 6015(c), and then grant petitioner equitable relief from the deficiency under sec. 6015(f), under Rev. Proc. 2003-61, sec. 4.04(1), 2003-2 C.B. 296, 299, petitioner apparently still would be disallowed a refund of amounts petitioner has paid on the deficiency (i.e., payments petitioner made on the deficiency prior to her request for sec. 6015(f) equitable relief relating thereto would not be refundable).

Sec. 6015(f) Relief

As explained, whatever interest in MGI petitioner may have held was only as a nominee, and none of the MGI income should be attributed to her.  Rev. Proc. 2003-61, sec. 4.01(7)(b).  Petitioner is potentially eligible for section 6015(f) equitable relief from the entire $17,516 underpayment.

As respondent acknowledges, most of the equitable factors set forth in Rev. Proc. 2003-61, supra, support the relief petitioner requests under section 6015(f): (1) Petitioner and John are divorced; (2) under the divorce decree, John had a legal obligation to pay the 1995 unpaid Federal income taxes and any penalties and interest relating thereto; (3) petitioner did not receive a significant benefit (beyond support) from the unpaid underpayment; and (4) petitioner has complied with the income tax laws in the years following 1995.

Three remaining factors require further analysis.

(1) Economic Hardship

A requesting spouse will be regarded as suffering economic hardship if the requesting spouse, if not granted relief, will be unable to pay his or her reasonable basic living expenses.  Rev. Proc. 2003-61, sec. 4.02(1)(c), 2003-2 C.B. at 298, sec. 4.03(2)(a)(ii).

Respondent determined, and we agree, that it appears that petitioner will not suffer economic hardship if relief is not

granted. Petitioner earns approximately $52,000 a year, and rents a comfortable home. Petitioner and John's $17,516 underpayment has already been paid in full, and thus no further payments will be required from petitioner if relief is not granted.

We note, however, that petitioner did pay significant other debts attributable to John and to his business. Petitioner also has had to rebuild her credit due to John's conduct. For 6 years petitioner worked for John without being paid. John squandered most of the marital assets, including the equity in the Castle Rock home, leaving little for petitioner after the divorce.

These additional factors mitigate the weight to be given the economic hardship factor.

(2) Knowledge or Reason To Know

It appears that petitioner should have been on notice that the $17,516 underpayment might not be paid. Enclosed with the tax return was a letter from petitioner and John stating that full payment could not be made with the return. In previous years, petitioner and John had had difficulty paying their Federal income taxes. These facts combined with John's continuing business and financial difficulties should have put petitioner on notice that the $17,516 underpayment reflected on the 1995 joint Federal income tax return might not be paid in full.

Respondent correctly concluded that this factor weighs against granting relief to petitioner.

## (3) Abuse

Respondent minimized the abuse petitioner suffered. An alternate writeup accompanying respondent's Appeals Office determination states:

> The abuses outlined in the claimant's arguments do not appear to have been more than her willingness to hold a subservient role in the relationship. There is no indication that she was called names, ridiculed, criticized or belittled.

We disagree. The material petitioner submitted to respondent and which is found in the administrative record in this case, as well as vivid and credible trial testimony herein, thoroughly establishes the extensive and severe abuse petitioner suffered from John.

Due to the severity of the abuse suffered by petitioner, this factor strongly favors granting relief to petitioner.

Further, John's extensive abuse of petitioner mitigated petitioner's reason to know that John might not pay the underpayment. See Rev. Proc. 2003-61, sec. 4.03(2)(b)(i).

## Overton's Son

Respondent also considered the impact on Overton's son of granting petitioner equitable relief. Respondent concluded that

- 23 -

because granting relief to petitioner might reduce John's estate and the inheritance Overton's son might be entitled to receive, this factor weighed against granting equitable relief to petitioner.

Although sympathetic to the potential adverse financial effect of our decision herein on Overton's son, we do not find this factor particularly relevant, nor does it outweigh the factors which weigh in favor of granting petitioner equitable relief.[6]

Conclusion

Respondent correctly concluded that petitioner does not qualify for relief under section 6015(b).

Respondent correctly concluded that petitioner qualified generally for relief under section 6015(c); however, we hold that petitioner qualified for relief with regard to the entire $6,452 deficiency, not just 50 percent thereof.

Respondent incorrectly rejected petitioner's request for section 6015(f) equitable relief as to the 50 percent of the $17,516 income tax underpayment nominally attributable to petitioner.

We agree with respondent's conclusion that petitioner is entitled to section 6015(f) equitable relief as to 50 percent of

---

[6] John's third wife, with proceeds from insurance on John's life, provided Overton's son with a $30,000 trust fund.

the $17,516 underpayment, but we hold that respondent abused his discretion in not granting petitioner relief for the balance of the $17,516 underpayment and the related penalty, additions to tax, and interest. Such additional relief is to be granted to petitioner.

To reflect the foregoing,

Decision will be entered

under Rule 155.[7]

---

[7] Under our holding herein, refunds to petitioner relating to petitioner and John's underpayment and deficiency may be limited, respectively, under Rev. Proc. 2003-61, sec. 4.04(2), and sec. 6015(g)(3). In the Rule 155 computation, the parties are to resolve how petitioner's various payments are to be allocated among the underpayment, the deficiency, and the penalty, additions to tax, and interest.